## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TAMARA OGIER, Trustee for the
Bankruptcy Estate of Brittany Dakota
Bosley, Case No. 20-70664-SMS, and
BRITTANY DAKOTA BOSLEY,

      Plaintiffs,

v.

INTERNATIONAL FOLLIES, INC. D/B/A
CHEETAH,

      Defendant.

Civil Action File No.
1:21-cv-2421-VMC

## DEFENDANT'S RESPONSE TO "PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS PRESENTING A GENUINE ISSUE FOR TRIAL" AND NOTICE OF OBJECTION TO EVIDENCE

COMES NOW, Defendant International Follies, Inc. d/b/a Cheetah ("Cheetah") and respectfully responds to "Plaintiffs' Statement of Additional Material Facts Presenting a Genuine Issue for Trial" [Doc. 47-3], as follows:

Cheetah states that the purported additional facts proffered by Plaintiffs are almost entirely immaterial and/or false.

Cheetah further objects to certain purported additional facts that are only supported by citation to the Declaration of Brittany Dakota Bosley ("Bosley Declaration") [Doc. 47-1]. The Bosley Declaration is cited as the sole evidentiary basis for a vast majority of Plaintiffs' purported additional facts.

1

## Notice of Objections to Bosley Declaration

When a party challenges the other party's evidence, "the proper vehicle" is a notice of objection. Wilson v. Greater Ga. Life Ins. Co., 2015 WL 11549074, *1, *2 (N.D. Ga. May 21, 2015). In the Eleventh Circuit, "conclusory allegations" contained in a declaration "have no probative value." Wilson, 2015 WL 11549074, at *2 (citing Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) (internal quotations omitted). Declarations must be made based on personal knowledge, not legal conclusions, must "set out facts that would be admissible in evidence," and must demonstrate that the "declarant is competent to testify on the matters stated." Kimemiah v. Sun Valley Tech Sols., Inc., 2016 WL 7438018, *1, *4 (N.D. Ga. Jan. 8, 2016). The Kimemiah court explained that, "[r]ecognizing that a party might try to avoid summary judgment by using affidavits to create issues of fact where none exist, the Eleventh Circuit allows the Court to disregard an affidavit as a 'sham' if it directly contradicts earlier deposition testimony in a manner that cannot be explained." Id. (citing Van T. Junkins & Assoc, Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657-58 (11th Cir. 1984)).

Federal Rule of Civil Procedure Rule 56 requires that a "declaration used to support or oppose a motion must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4);

Hetherington v. Wal-Mart, Inc., 511 F. App'x 909, 911 (11th Cir. 2013). Accordingly, "an affiant should state the basis for [her] personal knowledge." Longleaf in Vinings Homeowners Association, Inc. v. QBE Ins. Corp., 2015 WL 11232360, *1, *6 (N.D. Ga. Mar. 12, 2015), aff'd, 646 F. App'x 823 (11th Cir. 2016) (quotation and citation omitted). Bosley provides no basis for her personal knowledge regarding what house moms or bouncers did with respect to any other dancers; yet, nearly all of her statements in her Declaration broadly concern other "dancers."

Cheetah objects to a number of paragraphs of Bosley's Declaration as set forth herein below, including, to wit, ¶¶ 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 18.

**Response To "Plaintiffs' Statement Of Additional Material Facts"**

1.  House moms are responsible for interviewing prospective dancers who want to audition to work at Cheetah. Bosley Declaration ¶ 3.

    **Response:**  Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley. Further, as Bosley testified, "But then they go on to the stage audition [with Robert "Bob" Johnson, the general manager] and then it goes down to Bob, whether or not they get the job."

2.  That process entails filling out paperwork with the house mom's assistance and answering a series of questions asked by the house mom. Bosley

Declaration ¶ 3.

**Response:**   Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley. Further, as Bosley testified, "But then they go on to the stage audition [with Robert "Bob" Johnson, the general manager] and then it goes down to Bob, whether or not they get the job."

3.   Following that interview, if the house mom believes you are a good candidate, she will then give your application materials to the general manager for a final stage audition. Bosley Declaration ¶ 3.

**Response:**   Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley. Further, as Bosley testified, "But then they go on to the stage audition [with Robert "Bob" Johnson, the general manager] and then it goes down to Bob, whether or not they get the job."

4.   House moms are also responsible for training newly hired dancers at Cheetah. When a dancers arrives for her first shift, the house mom goes through club rules, gives the dancers a tour of the premises explaining operations to her, and answers questions the dancer may have about how to perform her job. Bosley Declaration ¶ 4.

**Response:**   Cheetah objects as this statement is immaterial as any tips to

house moms were voluntarily given by Bosley. Cheetah further objects and moves to strike this declaration testimony as it is directly contradicted by the deposition given by Bosley. See supra. During her deposition, Bosley was asked who told her about the 10% tip pool, to which she volunteered that "It was either **the dancer that trained me** or the house mom. It was one of the two, but I can't give you a solid answer." Bosley Tr. 37:23-38:3; see also Bosley Tr. 21:2-8 (testifying that she "had trained" two other dancers).

5.   At Cheetah, dancers are required to obtain approval from a house mom when they want to trade shifts with another dancer, when they need to miss one of their regular shifts, or when they want to change their regular shift schedule. Bosley Declaration ¶ 5.

**Response:**   Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley.

6.   Decisions about such changes are usually made by the house mom on the spot, without input from any other management. Bosley Declaration ¶ 5.

**Response:**   Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley.

7.   Cheetah house moms regularly direct the work of dancers during their shifts, ordering them to appear on stage or the floor when needed and telling dancers to change their clothing if the house mom finds it problematic or

unattractive. Bosley Declaration ¶ 6.

**Response:**  Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley. Cheetah further objects to the phrase "direct the work," as it is vague, ambiguous, misleading, and to the extent it calls for a legal conclusion.

8. Similarly, if a bouncer believes your clothing is inappropriate, he is authorized to order a dancer off stage to fix the problem. Bosley Declaration ¶ 7.

**Response:** Cheetah objects as this statement is immaterial. Cheetah further objects and moves to strike this declaration testimony as it is directly contradicted by the deposition given by Bosley. See supra. During her deposition, Bosley confirmed that other than being put on a "no-drink" list by Bob Johnson after failing a breathalyzer one night, she was never written up or disciplined in any other way at Cheetah. Bosley Tr. 44:18-45:25. The only time Bosley spoke to a bouncer about a stage set is when she missed her set. Bosley Tr. 83:17-22. Bosley was specifically asked, "Do you know who had final decision on discipline of the dancers?" to which she unequivocally responded, "I don't." Bosley Tr. 84:5-7.

9. House moms keep written records relating to attendance, their "boutique" budget and sales to dancers, attendance, and incidents that need to be communicated to management, who are often not present, leaving the house

moms in charge. Bosley Declaration ¶ 8.

**Response:**   Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley. This statement is also not based on Bosley's personal knowledge and/or there is no indication of how she would have personal knowledge regarding such matters.

10.   House moms regularly handle complaints by dancers about customers or other dancers. Bosley Declaration ¶ 9.

**Response:**   Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley.

11.   Even when a manager is present, the house mom is typically the person that a dancer goes to with such problems. Bosley Declaration ¶ 9.

**Response:**   Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley.

12.   Dancers also go to bouncers with complaints about customers and other dancers, but this is typically limited to situations that need to be handled immediately (e.g., if someone is being belligerent). Bosley Declaration ¶ 10.

**Response:**  Cheetah objects as this statement is immaterial.

13.   House moms regularly discipline employees by sending them home, for example, if they are too drunk, have missed stage sets, have shown a bad attitude, or for any number of other reasons. Bosley Declaration ¶ 11.

**Response:** Cheetah objects as this statement is immaterial. Cheetah further objects and moves to strike this declaration testimony as it is directly contradicted by the deposition given by Bosley. See supra. During her deposition, Bosley confirmed that other than being put on a "no-drink" list by Bob Johnson after failing a breathalyzer one night, she was never written up or disciplined in any other way at Cheetah. Bosley Tr. 44:18-45:25 and 84:1-7. Bosley did not know who had the final say on putting her on the "no-drink list" but knew that Johnson and a house mom had spoken before Bosley was brought in to Johnson's office. Id. Bosley was never disciplined for missing a stage set; rather, the house mom would just have her "make up another set." Bosley Tr. 83:13-16. Bosley was specifically asked, "Do you know who had final decision on discipline of the dancers?" to which she unequivocally responded, "I don't." Bosley Tr. 84:5-7.

14.   House moms regularly discipline dancers when no manager is present and the decisions is necessarily made solely by the house mom. Bosley Declaration ¶ 11.

**Response:** Cheetah objects as this statement is immaterial. Cheetah further objects and moves to strike this declaration testimony as it is directly contradicted by the deposition given by Bosley. See supra. During her deposition, Bosley confirmed that other than being put on a "no-drink" list

by Bob Johnson after failing a breathalyzer one night, she was never written up or disciplined in any other way at Cheetah. Bosley Tr. 44:18-45:25 and 84:1-7. Bosley did not know who had the final say on putting her on the "no-drink list" but knew that Johnson and a house mom had spoken before Bosley was brought in to Johnson's office. Id. Bosley was never disciplined for missing a stage set; rather, the house mom would just have her "make up another set." Bosley Tr. 83:13-16. Bosley was specifically asked, "Do you know who had final decision on discipline of the dancers?" to which she unequivocally responded, "I don't." Bosley Tr. 84:5-7.

15. Bouncers direct the work of dancers by telling them to go to a different area of the club or to stay away from a specific customer or dancer. Bosley Declaration ¶ 12.

**Response:** Cheetah objects as this statement is immaterial. Cheetah further objects to the phrase "direct the work," as it is vague, ambiguous, misleading, and to the extent it calls for a legal conclusion.

16. Such decisions have been made on the spot when a problem arose and are not pre-approved by management. Bosley Declaration ¶ 12.

**Response:** Cheetah objects as this statement is immaterial. Cheetah further objects to the phrase "[s]uch decisions" and the preceding statement's phrase "direct the work," as it is vague, ambiguous, misleading, and to the extent it

calls for a legal conclusion.

17.   Cheetah house moms regularly give feedback to dancers about their job performance and instruct them how to perform their jobs better, such as dancing tips, how to approach and interact with customers, or reminding them about the rules of when certain articles of clothing should be removed. Bosley Declaration ¶ 13.

**Response:** Cheetah objects as this statement is immaterial.

18.   House moms regularly recommend specific dancers to customers for VIP performances. Bosley Declaration ¶ 14.

**Response:** Cheetah objects as this statement is immaterial. Cheetah further states that Bosley testified that she had been recommended to a table by a house mom only three (3) to five (5) times in the 2 ½ years that she worked at Cheetah. Bosley Tr. 94:17-21. Cheetah moves to strike this allegation as it is not based on personal knowledge.

19.   They frequently request that dancers perform extra stage sets, sometimes offering to allow a dancer to leave early if she will do the extra stage set. Bosley Declaration ¶ 14.

**Response:** Cheetah objects as this statement is immaterial. Cheetah further objects as "[t]hey" in this statement is vague and ambiguous.

20.   Bouncers also make recommendations to customers for specific dancers to

1

do performances. These recommendations are entirely at the bouncer's discretion and the performances that result from their recommendations are a major source of dancer income. Bosley Declaration ¶ 15.

**Response:**  Cheetah objects as this statement is immaterial. Moreover, Cheetah disputes this statement to the extent that it implies that a bouncer had complete discretion about a VIP performance; rather, obviously, a dancer would have discretion to take any VIP customer, and a customer would also have discretion to select a dancer. Bosley testified that she was able to get her own VIP customers more often than she was referred a VIP customer by engaging with the customers. Bosley Tr. 97:21-99:2.

21. House moms regularly police dancers' clothing and footwear, telling them to change them if they do not comply with club policy (e.g., 4-plus inch heels and open toes are required) or even if they simply believe the articles are unattractive or overly worn. Bosley Declaration ¶ 16.

    **Response:**  Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley. Cheetah objects to the extent this statement is vague, ambiguous, misleading, and calls for legal conclusions.

22. The house moms have the authority not to permit a dancer to appear on stage if they do not approve of their clothing. Bosley Declaration ¶ 16.

**Response:**  Cheetah objects as this statement is immaterial as any tips to house moms were voluntarily given by Bosley.

23.    Both house moms and bouncers at Cheetah are responsible for administering breathlyzer tests, observing dancers for signs that they are overly intoxicated and unsafe to drive, checking VIP rooms for dancer safety, enforcing no smoking rules, and intervening when customers are unruly. Bosley Declaration ¶ 17.

**Response:**  Cheetah objects as this statement is immaterial. Cheetah further objects that this statement is compound, vague, and ambiguous. Bosley testified that dancers would "go to the back to wait for the house mom to breathalyze you so you could clock out and go home." Bosley Tr. 70:3-6. Thus, her declaration testimony to the effect that bouncers do so is contradictory.

24.    Bouncers also monitor the premises to ensure that dancers are safe when coming and going from the property. Bosley Declaration ¶ 17.

**Response:**  Undisputed.

25.    Both house moms and bouncers are responsible for monitoring the club's legal compliance with respect to laws prohibiting customer–dancer contact, prostitution, and sexually explicit behavior (e.g., touching genitals on stage). Bosley Declaration ¶ 18; Bosley Tr. at 85:7–13.

**Response:**  Cheetah objects as this statement is immaterial. Although house moms and bouncers did attempt to ensure that improper customer-dancer contact did not occur, Cheetah objects to the allegation that they were "responsible for monitoring the club's legal compliance with respect to [any such] laws." Bosley testified that a dancer would go to a bouncer "if a customer hasn't paid us enough or a customer is being too handsy. We also were told to go to a bouncer if we saw another dancer doing something they weren't supposed to do [with respect to a customer]." Bosley Tr. 85:7-25. Given that Bosley did not have personal knowledge regarding decision-making in general for Cheetah, as reflected in her deposition, she cannot possibly have personal knowledge regarding who at Cheetah is "responsible for monitoring the club's legal compliance" with any laws.

26.   When either a house mom or bouncer believes that they have witnessed a legal violation, they are authorized to order a dancer off stage or out of a VIP performance. Bosley Declaration ¶ 18.

**Response:**   Cheetah objects as this statement is immaterial. Cheetah incorporates its response to statement No. 25 as if fully restated herein.

27.   Bosley perceived that she experienced "passive-aggressive coercion" to give additional tips to bouncers and house moms because they

would only recommend certain dancers to go to tables that wanted to do VIPs and spend a lot of money and stuff like that. They would only

1

recommend the dancers to those tables if the dancer they knew that dancer was going to tip them out. Like it was someone, veterans, I guess is what you would say, someone who had been there a while that knew the bouncers and stuff. The only way that bouncers would recommend you to tables is if you tipped them. Same with like house moms. They would let you leave early or maybe miss a day if you tipped them often and well, but otherwise they wouldn't."

Bosley Tr. at 51:12 to 52:2.

**Response:** Cheetah objects as this statement is immaterial. Cheetah prohibited and prohibits tipping for referrals or introductions to VIP customers and for recommending an entertainer to any customer or VIP. During Bosley's employment, Cheetah had a poster hanging on the bullet board that states: "Entertainers are **not permitted** to tip anyone including **floor managers, housemoms, waitstaff, or any Cheetah employee**, for **referral or introduction to a VIP customer**, or for **recommending an entertainer to any customer** for a VIP room experience." Bosley, Ex. 10 (emphasis added), 110:16-111:9. Bosley had seen and was aware of the poster during the course of her employment with Cheetah. Bosley Tr. 110:19-20; 111:10-13. Her decision to tip bouncers and house moms, to the extent she did so, was a violation of Cheetah's Policies, and she failed to alert Jack Braglia ("Braglia") that she was making such tips. Bosley Tr. Ex. 3; Bosley Tr. 49:17-50:22, 108:18-110:5. Bosley <u>never</u> reported to Braglia that she was tipping for VIP referrals. <u>Id.</u> at 50:23-51:5, 110:6-9, 122:13-17.

1

In fact, Bosley <u>never</u> told anyone else at Cheetah about tipping the bouncers outside of the tip pool. <u>Id.</u> at 53:9-16. To the extent Bosley voluntarily tipped bouncers, Bosley "never [had] a spoken arrangement" to tip for a VIP referral. <u>Id.</u> at 52:19-22. Instead, Bosley would tip "depending on how much [she] made from that recommendation." <u>Id.</u> at 53:5-8. Bosley could have gotten (and did get) her own VIP customers "[b]y sitting and talking to customers," but that process could be time consuming. <u>Id.</u> at 97:21-25, 98:15-22. She actually "received [her] own [VIP customers] more frequently" than they were recommended to her. <u>Id.</u> at 98:6-10.

28.   Bosley personally noticed how bouncers would no longer recommend them to customers if they stopped tipping bouncers on top of the mandatory tip pool contribution. Bosley Tr. at 52:22 to 53:4.

**Response:**    Cheetah objects as this statement is immaterial. Cheetah prohibited and prohibits tipping for referrals or introductions to VIP customers or for recommending an entertainer to any customer or VIP. Cheetah had a poster hanging on the bullet board that states: "Entertainers are **not permitted** to tip anyone including **floor managers, housemoms, waitstaff, or any Cheetah employee**, for **referral or introduction to a VIP customer**, or for **recommending an entertainer to any customer** for a VIP room experience." Bosley, Ex. 10 (emphasis added), 110:16-111:9. Bosley

1

had seen and was aware of the poster during the course of her employment with Cheetah. Bosley Tr. 110:19-20; 111:10-13. Her decision to tip bouncers and house moms, to the extent she did so, was a violation of Cheetah's Policies, and she failed to alert Braglia that she was making such tips. Bosley Tr. Ex. 3; Bosley Tr. 49:17-50:22, 108:18-110:5. Bosley <u>never</u> reported to Braglia that she was tipping for VIP referrals. <u>Id.</u> at 50:23-51:5, 110:6-9, 122:13-17. She <u>never</u> told anyone else at Cheetah about tipping the bouncers outside of the tip pool. <u>Id.</u> at 53:9-16.

29.   Bosley also observed that house moms began recommending customers to her after she got on their good side by tipping them well. Bosley Tr. at 56:9–15.

**Response:**   Cheetah objects as this statement is immaterial. Cheetah prohibited and prohibits tipping for referrals or introductions to VIP customers or for recommending an entertainer to any customer or VIP. Cheetah had a poster hanging on the bullet board that states: "Entertainers are **not permitted** to tip anyone including **floor managers, housemoms, waitstaff, or any Cheetah employee**, for **referral or introduction to a VIP customer**, or for **recommending an entertainer to any customer** for a VIP room experience." Bosley, Ex. Ex. 10 (emphasis added), 110:16-111:9. Bosley had seen and was aware of the poster during the course of her

1

employment with Cheetah. Bosley Tr. 110:19-20; 111:10-13. Her decision to tip bouncers and house moms, to the extent she did so, was a violation of Cheetah's Policies, and she failed to alert Braglia that she was making such tips. Bosley Tr. Ex. 3; Bosley Tr. 49:17-50:22, 108:18-110:5. Bosley <u>never</u> reported to Braglia that she was tipping for VIP referrals. <u>Id.</u> at 50:23-51:5, 110:6-9, 122:13-17. She <u>never</u> told anyone else at Cheetah about tipping the bouncers outside of the tip pool. <u>Id.</u> at 53:9-16.

30.    House moms and bouncers informed dancers when their turn to appear on stage had come to ensure that they appeared at that time. Bosley Tr. at 59:11–16; 83:7–9.

**Response:** Cheetah objects as this statement is immaterial. Further, it is denied. The cited testimony does not support the statement. Bosley testified that she "could" find out her *stage rotation* from the house mom or bouncer based on either a color rotation or time slot. Bosley Tr. 59:13-21 and 59:25-60:13 ("Q. And is that something that you find out at the beginning of your shift? A. Yes."). She was then asked, "where would you go to find out your color or now your time slot for the stage rotations?" <u>Id.</u> at 60:5-6. She responded that she "could ask the house mom or one of the bouncers or the DJ." <u>Id.</u> at 60:7-8. The list with that information was kept "[a]t the DJ's booth." <u>Id.</u> at 60:9-13. Bosley did <u>not</u> testify that a house mom or bouncer

1

would track her (or any other dancer) down for each stage rotation "to ensure that they appeared at that time," as stated. Although Bosley said that "bouncer and the house moms, primarily" made sure she made her stage rotations, she explained that she was never disciplined for missing a stage set. Id. at 83:2-19.

31.    On one occasion, a bouncer became very upset when Bosley was late to a stage set and said that if it happened again he wouldn't let her check into VIP all night. Bosley Tr. at 83:17–22.

**Response:** Cheetah objects to the extent that this statement calls for hearsay regarding what a bouncer allegedly said to Bosley. Subject to same, although Cheetah admits that Bosley stated what is in No. 31,  Bosley further testified that she did not talk with Robert "Bob" Johnson, the general manager, or any house moms about that alleged interaction with a bouncer. Bosley Tr. 83:23-25. Furthermore, Bosley was not disciplined for that incident or at any other time at Cheetah. Id. at 84:1-4.

32.    Cheetah bouncers' official job title as used by the club management itself is "floor manager." Bosley Tr. at 70:22 to 71:6 and Exhibit 3 thereto.

**Response:** Cheetah objects as this statement is immaterial. A label or title does not determine job duties, roles, or positions under the FLSA. Moreover, Bosley testified that bouncers and floormen (and floor manager) are the

same, but Bosley refers to them as bouncers along with "everyone at the club refers to them as, like all the employees, even Bob and Jack and house mom." Bosley Tr. 113:21-114:14.

33.   If a dancer showed up for the night shift after 10:00 PM, the house mom would not allow her to work that night. Bosley Tr. at 81:24 to 82:1.

**Response:** Cheetah objects as this statement is immaterial. Further, the cited testimony does not    support   the statement. Bosley was asked what the consequences were for not being on the floor by 10:00 p.m., to which she responded, "[t]he house mom would just be like get ready faster, stuff like that. I mean, if it was a repetitive thing, then you might get a talking to from the house mom *or from Bob* [Johnson]. . . . There wasn't any real repercussions. If you actually showed up at work after 10:00 p.m., they wouldn't let you work that night." Bosley Tr. 81:17-82:1. Bosley did not define who "they" meant, but it is reasonable that she meant Cheetah (*e.g.*, her employer) would not allow a dancer who showed up after 10:00 p.m. to go onto the floor. Furthermore, that never happened to Bosley anyway, so she has no personal knowledge regarding any such alleged consequences. Id. at 82:2-6.

Respectfully submitted this 5th day of July, 2022.

SCHULTEN WARD TURNER & WEISS, LLP

*/s/ Andrea L. Pawlak*
Andrea L. Pawlak, Georgia Bar No. 142541
Schulten Ward Turner & Weiss, LLP
260 Peachtree Street, N.W., Suite 2700
Atlanta, Georgia 30303
404-688-6800 (Phone)
404-688-6840 (Fax)
a.pawlak@swtwlaw.com
*Counsel for Defendant International Follies, Inc.*
*d/b/a Cheetah*

## <u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

I hereby certify that this filing complies with the requirements of Local Rule 5.1C (Times New Roman, 14 point) and that I have this day served a copy of the within and foregoing upon counsel of record by CM/ECF which will cause a copy to be served electronically upon all counsel of record.

So certified this 5th day of July, 2022.

SCHULTEN WARD TURNER & WEISS, LLP

*/s/ Andrea L. Pawlak*
Andrea L. Pawlak, Georgia Bar No. 142541
Schulten Ward Turner & Weiss, LLP
260 Peachtree Street, N.W., Suite 2700
Atlanta, Georgia 30303
404-688-6800 (Phone)
404-688-6840 (Fax)
a.pawlak@swtwlaw.com
*Counsel for Defendant International Follies, Inc.*
*d/b/a Cheetah*